REVISED JANUARY 18, 2008

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 28, 2007

Charles R. Fulbruge III
Clerk

No. 06-31045

_____

NORMAL PARM, JR; HAROLD EUGENE WATTS; ROY MICHAEL
GAMMILL; WILLIAM T ROGERS; ROBERT ALLEN BALCH

                                        Plaintiffs - Appellants

v.

MARK SHUMATE, in his official capacity as Sheriff of East Carroll Parish

                                        Defendant - Appellee

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

Before KING, GARZA, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

    Plaintiffs-appellants Normal Parm, Jr., Harold Eugene Watts, Roy
Michael Gammill, William T. Rogers, and Robert Allen Balch ("Plaintiffs"),
recreational fishermen, appeal the district court's denial of their summary
judgment motion and the grant of the cross-motion for summary judgment by
defendant-appellee East Carroll Parish Sheriff Mark Shumate ("Sheriff
Shumate"). Plaintiffs brought their claims against Sheriff Shumate under 42
U.S.C. § 1983, alleging that they were falsely arrested for trespass when they
refused to cease fishing on waters covering ordinarily dry, private property (the
"Property") owned by Walker Cottonwood Farms, L.L.C., successor-in-title to

Walker Lands, Inc. (collectively "Walker"). Plaintiffs argue that Sheriff Shumate lacked probable cause to arrest them for fishing on the Property because the public has a federal and state right to fish on the Property when it is submerged under the Mississippi River. Because we disagree, we AFFIRM the district court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The underlying dispute in this case began over a decade ago, and the facts have been considered in various forms by multiple courts, including this one. Plaintiffs are lifelong boaters, hunters, and fisherman who fish on the Mississippi River in East Carroll Parish and other river parishes in northeast Louisiana. The water levels of the Mississippi River fluctuate seasonally. In East Carroll Parish, the normal low water mark is seventy-seven feet above mean sea level. Yet during the spring season the river floods well beyond its normal channel—as a result of increased rainfall and snow melt in the North—and the river regularly rises to as high as one hundred and twelve feet above mean sea level. It is normal for the river to remain at this level for at least two months.

The Property is located in East Carroll Parish. On its eastern side, the Property is bound by the Mississippi River, and on its western side, it is bound by the Mississippi River's levees. Buildings, crop lands and forests, with trees as tall as one hundred and forty feet, are located on the Property. In addition, waterways known as Gassoway Lake, Little Gassoway Lake, and other bodies of water are contained within its boundaries. Gassoway Lake, which Plaintiffs consider the most ideal venue for fishing on the Property, is located on the Property's western side, nearly three-and-a-half miles from the ordinary low water mark of the Mississippi River and its channel. Gassoway Lake is

connected by a man-made drainage ditch to Bunch's Cutoff, which, in turn, flows into the Mississippi River. When the river floods in the spring, Gassoway Lake, along with the rest of the Property, is submerged under its waters.

Plaintiffs have fished the waters of Gassoway Lake when it was flooded by the Mississippi River, even though they knew that Walker objected to their presence. In 1996, Walker began filing complaints with Sheriff Shumate against boaters fishing on Gassoway Lake. Sheriff Shumate responded by arresting Plaintiffs, and others found on the Property, for trespass.[1] While admitting that they did not have Walker's permission, Plaintiffs claimed that they were entitled to fish on the Property when it was flooded because Gassoway Lake was either: (1) owned by the State of Louisiana on behalf of the public; or (2) subject to state and federal servitudes.

The Attorney General for the State of Louisiana agreed with Plaintiffs' position and issued Louisiana Attorney General Opinion No. 96-206, concluding that channels of the Mississippi River traversed the Property and were "river bed" owned by the State. His opinion stated that "Lake Gassoway is a naturally navigable body of water under both State and Federal law and actually supports navigation for such purposes as hunting, fishing, [and] trapping . . . ." He also determined that the Property was subject to a public servitude. Notwithstanding this opinion, Sheriff Shumate continued to arrest fishermen found on the Property. However, the East Carroll Parish District Attorney, James "Buddy" Caldwell, informed Sheriff Shumate that he did not intend to

---

[1] Specifically, they were arrested for violating LA. REV. STAT. ANN. § 14:63(B), which states: "No person shall enter upon immovable property owned by another without express, legal, or implied authorization."

prosecute any of the Plaintiffs for trespass until the ownership and public servitude issues were resolved. To this day, Plaintiffs have not been prosecuted.

On June 10, 1996, Walker filed suit in Louisiana state court against the East Carroll Police Jury, seeking a declaration that it owned the Property and an injunction prohibiting members of the public from entering without permission. Walker Lands, Inc. v. Louisiana, No. 17,746, slip op. at 1-2 (La. 6th Dist. Ct., May 1, 2003). The state trial court issued a temporary restraining order prohibiting the Police Jury, and all other persons or government agencies, from entering Gassoway Lake without permission for any purpose, including boating, fishing, or hunting. Id. at 2. The Police Jury filed a third-party demand against the State of Louisiana. The State was added as an indispensable party, and the Police Jury was eventually dismissed. Id. On March 16, 1998, the court granted Walker's motion for summary judgment and issued a permanent injunction. Id. The State appealed to the Second Circuit Court of Appeal of Louisiana, which reversed, holding that the issues could not be resolved on summary judgment. Id.; Walker Lands, Inc. v. East Carroll Parish Police Jury, No. 31,490, slip op. at 5 (La. Ct. App., March 5, 1999).

On December 17, 2001, with the state trial court yet to issue a final decision, Plaintiffs filed this case in federal district court. Plaintiffs alleged that Sheriff Shumate lacked probable cause to arrest them in light of the opinion of the State Attorney General and the decision of the Second Circuit Court of Appeal. They claimed that:

> Until there is rendered a final judgment in the litigation pending in the Sixth District Court between [Walker] and the State of Louisiana, there is not sufficient legal evidence to prove, beyond a reasonable doubt, that the use of the naturally and regularly

4

> navigable waters of the Mississippi River, including those navigable waters that include Gassoway Lake, Little Gassoway, the old channel and Bunch's Cut-Off, results in a criminal trespass of the land of [Walker,] so long as the Plaintiffs utilize naturally occurring, navigable waters of the Mississippi River.

Plaintiffs sought damages for false arrest under 42 U.S.C. § 1983 and an injunction prohibiting further arrests for fishing on the Property until a "final judgment is rendered by a court of competent jurisdiction, specifying the ownership and navigational rights of the State of Louisiana and [Walker] relative to the [Property] . . . during normal water heights . . . ."

On June 4, 2002, Plaintiffs filed a motion for summary judgment, and on July 8, 2002, Sheriff Shumate filed a cross-motion for summary judgment or, in the alternative, a motion to stay the case pending resolution of the state court proceedings. Both motions were referred to a magistrate judge for a report and recommendation. Because there was a "reasonable probability that the state courts [might] find the waters at issue to be navigable and thus public," the magistrate judge held that a federal decision in this case could be obviated by the state proceeding. The district court adopted the report and recommendation, stayed the federal case, and Plaintiffs appealed. In an unpublished decision, we agreed that the questions of Louisiana law, then pending in a Louisiana court, might "render it unnecessary for federal courts to decide the constitutional issues presented in this case[,]" and affirmed the district court's stay. Parm v. Shumate, No. 02-31183, slip op. at 6 (5th Cir. June 16, 2003).

On May 1, 2003, the state trial court ruled that Walker owned the Property and had the right to exclude the public from it. Walker Lands, No. 17,746, slip op. at 1; see also Walker Lands, Inc. v. East Carroll Parish Police

5

Jury, 871 So.2d 1258, 1261 (La. Ct. App. 2004). The court first noted that it was undisputed that the Property was either woodland or farmland in 1812, the year that Louisiana was admitted to the Union as a State.[2] Walker Lands, No. 17,746, slip op. at 1; Walker Lands, 871 So.2d at 1261. It found that during the 1860s and 1870s, the Mississippi River slowly but gradually shifted westward and submerged the Property. Walker Lands, No. 17,746, slip op. at 1; Walker Lands, 871 So.2d at 1261. When the river subsequently shifted back eastward, it left behind a swale—a shallow depression in the land—which became Gassoway Lake through alluvion or accretion.[3] Walker Lands, No. 17,746, slip op. at 11-12; Walker Lands, 871 So.2d at 1261. Gassoway Lake and the other natural bodies of water on the Property were formed before 1910, when private landowners purchased it. Walker Lands, No. 17,746, slip op. at 11; Walker Lands, 871 So.2d at 1261. Moreover, the court determined that none of the waters on the Property were navigable. But for the man-made drainage ditch connected to Bunch's Cutoff and other structures, the court held, Gassoway Lake itself would be non-existent during the summer months. Walker Lands, No. 17,746, slip op. at 12-13. Since the waters lying on the Property were not navigable in fact, the trial court entered a permanent injunction prohibiting the public-at-large from going on Gassoway Lake, or on the land between Gassoway

---

[2] Bodies of water formed before 1812 are owned by the State. See Dardar v. LaFourche Realty Co., Inc., 985 F.2d 824, 826-27 (5th Cir. 1993).

[3] Alluvion and accretion are used synonymously to describe the addition of soil by gradual deposit. Walker Lands, 871 So.2d at 1264 n.13. Under Louisiana law, "[a]ny alluvion . . . which forms along the banks of a river belongs to the riparian landowners who own the land adjacent to the river, when the river shifts course." Id. at 1264 (citations omitted).

Lake and the Mississippi River. Walker Lands, No. 17,746, slip op. at 12-14; Walker Lands, 871 So.2d at 1262-63.

The State appealed the trial court's decision to the Second Circuit Court of Appeal, which affirmed in part and reversed in part. Walker Lands, 871 So.2d at 1268-69. The appellate court accepted the trial court's findings of fact and held that the Property was privately owned. The court rejected the State's argument that the Property was the bed of the Mississippi River—and therefore owned by the State—because a river's bed consists only of the land lying below the river's ordinary low water mark. Id. at 1262 n.7. It did not matter that the Mississippi River sometimes flooded the Property. Id. at 1264.

> Privately owned land does not become part of a navigable body of water when a nearby navigable body of water overflows its normal bed and temporarily covers the property. Gassoway Lake is landlocked and does not now lie in the bed of the Mississippi river, which is some three and one-half miles to the east; likewise, it is not a channel of the river, since it is cut off from it.

Id. (citations omitted). In addition, the court held that Gassoway Lake was not a navigable body of water owned by the State because it was not a navigable body of water in fact. Id. at 1265-66.

Nevertheless, the Second Circuit Court of Appeal lifted the state trial court's injunction because Walker lacked standing to seek relief against a hypothetical public-at-large. Id. at 1267. The court stated that while "[o]wners of private property may forbid entry to anyone for purposes of hunting or fishing and the like[,]" Walker could only ask for relief against a specific individual after that person had invaded the Property. Id. The court declined to resolve whether there was a public servitude on the Property during the Mississippi River's peak

7

stage. It observed that under Louisiana law, the bank of the Mississippi River consists of all the land lying between its ordinary low and high water marks, which includes all of the Property, and noted that a public servitude preserves a river's bank for the public's navigational use. Id. at 1268 & n.16. And while it stated that "[f]ishing and hunting on flooded lands do not meet the definition of using the bank of a river at its high water mark for a navigational purpose[,]" id. at 1268 n.6 (citations omitted), it "pretermit[ted] discussion" of the issue because the State had not properly raised it, id. at 1268.

On June 3, 2005, the Second Circuit Court of Appeal's decision became final when the Louisiana Supreme Court denied the State's application for a writ of certiorari. In light of the conclusion of the state court proceedings, on August 16, 2005, the district court lifted the stay in this case. The court ordered the parties to file supplemental briefs in support of their cross-motions for summary judgment and referred the matter to a magistrate judge for a report and recommendation. Sheriff Shumate filed briefs arguing that: (1) the case was moot because Plaintiffs merely sought relief "until the Second Circuit rules"; (2) there is no federal or state right to fish on private property above the Mississippi River's ordinary low mark; and (3) even if there was such a right, he was entitled to qualified immunity because it was not a clearly established constitutional right. Plaintiffs, on the other hand, argued that they were entitled to summary judgment because there is both a state and federal right to fish on the Property when it is submerged under the Mississippi River. They asserted that the case was not moot because their complaint sought damages for false arrest and an injunction, not just until the state proceeding was complete, but until the public's "navigational rights" were determined. Finally, they contended that

Sheriff Shumate was not entitled to qualified immunity because he was not being sued in his personal capacity.

On April 21, 2005, the magistrate judge issued his report and recommendation. He rejected Sheriff Shumate's alternative arguments, stating that: (1) the case was not moot because the state appellate court expressly pretermitted ruling on the issue of navigational rights; and (2) Sheriff Shumate was not entitled to qualified immunity because the case was not brought against him in his personal capacity. Turning to the fundamental question in the case, the magistrate judge held that no federal statute authorized Plaintiffs to fish on the Property, nor did the "federal navigational servitude," which is derived from the Commerce Clause of the United States Constitution, grant persons the right to fish on navigable waters. However, the magistrate judge determined that federal common law did create a right to fish on navigable waters, and that this public right burdens the Property when it is submerged under the waters of the Mississippi River. Similarly, the magistrate judge held that Louisiana law grants to the public the right to use—including for purposes of fishing—the "running waters" found in the State, regardless of the river's stage.

On August 29, 2006, the district court adopted the report and recommendation in part. It agreed that neither federal statutes nor the federal navigational servitude provides Plaintiffs with the right to fish on the Property. The district court disagreed, however, with the magistrate judge's determination that federal common law and state law granted such a right. The district court stated that while this court has recognized a public right to reasonably use navigable waters, we have not found a right to fish on private lands. Moreover, although the district court found that the Property is a bank of the Mississippi River under Louisiana law and subject to a state servitude, the servitude "is

9

limited to activities that are incidental to the navigable character of the Mississippi River and its enjoyment as an avenue of commerce. . . . [F]ishing and hunting are not included in these rights." Accordingly, the district court found that Sheriff Shumate had probable cause to arrest Plaintiffs for trespass and entered summary judgment on Sheriff Shumate's behalf.

This timely appeal followed.

## II. DISCUSSION

We review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000). "Summary judgment is proper when the evidence reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." Id. (citing FED. R. CIV. P. 56(c)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In order to prevail in a § 1983 claim for false arrest, a plaintiff must show that he was arrested without probable cause in violation of the Fourth Amendment. Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001) (citations omitted). In a suit brought against a municipal official in his official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Monell v. N.Y. City Dept. of Soc. Servs., 436 U.S. 658, 689 (1979). If a municipal officer who has authority to establish final municipal policy makes a decision or orders a course of action, the municipality may be held liable for the officer's decision or order.

Pembaur v. City of Cincinnati, 475 U.S. 469, 480-82 (1986); see also Turner v. Upton County, Texas, 915 F.2d 133, 136 (5th Cir. 1990) (holding that the municipality may be held liable for the illegal or unconstitutional actions of its final policy-makers as they engage in the setting of goals and the determination of how those goals will be achieved).

In this case, Sheriff Shumate does not argue that he lacked final policy-making authority. Nor does he continue to argue that he is entitled to qualified immunity, accepting Plaintiffs' assertion that they do not seek to hold him liable in his individual capacity. The key issue, therefore, is whether Plaintiffs have either a federal or state right to fish on the Property in the spring during the Mississippi River's normal flood stage. If they do not, Sheriff Shumate had probable cause to arrest them for trespass and was entitled to prevail on summary judgment.

A. Federal Rights

Plaintiffs argue that they have a federal right to fish on the Property when it is covered by the Mississippi River's waters because the Mississippi River is a navigable waterway of the United States. They contend that a federal navigational servitude burdens the Property, creating a public right to fish there. Plaintiffs also assert that there is a corresponding federal common law right to fish on the navigable waters of the United States. In response, Sheriff Shumate argues that: (1) the Property is not burdened by any federal easements because the Property is not a navigable waterway in fact; (2) the federal navigational servitude does not create a right to fish; and (3) there is no federal common law affecting riparian land owners' property interests.

It is well established that the Commerce Clause of the United States Constitution gives the federal government a "dominant servitude" over the

11

navigable waters of the United States.  United States v. Cherokee Nat. of Okla., 480 U.S. 700, 704 (1987) (citation omitted).  The so-called navigational servitude extends "laterally to the entire water surface and bed of a navigable waterway, which includes all the land and waters below the ordinary high water mark."  33 C.F.R. § 329.11(a); see also United States v. Rands, 389 U.S. 121, 123 (1967).  A river's ordinary high water mark is set at "the line of the shore established by the fluctuations of water . . . ."  33 C.F.R. § 329.11(a)(1).  It is ascertained by "physical characteristics such as a clear, natural line impressed on the bank; . . . changes in the character of the soil; destruction of terrestrial vegetation; . . . or other appropriate means that consider the characteristics of the surrounding areas."  Id.  The navigational servitude does not burden land that is only submerged when the river floods.  Oklahoma v. Texas, 260 U.S. 606, 632 (1923); United States v. Harrell, 926 F.2d 1036, 1041-43 (11th Cir. 1991); United States v. Claridge, 416 F.2d 933, 934 (9th Cir. 1970).[4]

As implied by its very name and the constitutional provision from which it arises, the federal navigational servitude is concerned with navigational rights and commerce.  See United States v. Montana, 450 U.S. 544, 551 (1981) ("The State's power over the beds of navigable waters remains subject to only one

_____

[4] Plaintiffs argue that the Property is below the high water mark based on the Second Circuit Court of Appeal's finding that the high water mark is one hundred and twelve feet above mean sea level (the high water mark during the spring flooding season).  The explanation for the Louisiana court's conclusion is that Louisiana has rejected the federal definition of high water mark and relies, instead, on the ordinary seasonal flood levels.  DeSambourg v. Bd. of Comm'rs for the Grand Prairie Levee Dist., 621 So.2d 602, 612 (La. 1993).  Unfortunately, neither party submitted sufficient summary judgment evidence to determine where the federal high water mark lies, although it is unlikely that it includes much of the Property.  See Harrell, 926 F.2d at 1043 ("To argue that the government's jurisdiction should extend laterally as much as three miles on either side of the Tombigbee river is ludicrous.").

limitation:  the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce."); Kaiser Aetna v. United States, 444 U.S. 164, 177 (1979) ("The navigational servitude . . . gives rise to an authority in the Government to assure that such streams retain their capacity to serve as continuous highways for the purpose of navigation in interstate commerce."); United States v. Chi. M., St. P. & P.R. Co., 312 U.S. 592, 596 (1941) ("[T]he rights of the title holder are subordinate to the dominant power of the federal Government in respect of navigation.") (citing Gibson v. United States, 166 U.S. 269, 272 (1897)).  Neither navigation nor commerce encompass recreational fishing.  See Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 482-84 (1988) (noting that fishing is not related to navigability); George v. Beavark, Inc., 402 F.2d 977, 981 (8th Cir. 1968) ("Although the rule on navigability has been at times liberalized, to our knowledge none of the authoritative cases has liberalized the rule so as to indicate that mere pleasure fishing on a stream of water is such usage as would constitute navigability."). Accordingly, the navigational servitude does not create a right to fish on private riparian land.

Moreover, Plaintiffs' claim to a federal right ignores "the 'general proposition [that] the law of real property is, under our Constitution, left to the individual States to develop and administer.'"  Phillips Petroleum, 484 U.S. at 484 (citation omitted).  Louisiana took title to all lands below navigable waters in its boundaries when it was admitted to the Union.  Dardar, 985 F.2d 824, 826-27 (citation omitted); see also Texas v. Louisiana, 410 U.S. 702, 714 (1973); Utah v. United States, 403 U.S. 9, 10 (1971); Pollard's Lessee v. Hagan, 44 U.S. 212, 230 (1845).  It has broad authority to regulate public trust lands, including the

Property, as it sees fit. See Phillips Petroleum, 484 U.S. at 482-84. Louisiana may regulate or prohibit the use of land held in public trust. See McCready v. Virginia, 94 U.S. 391, 395 (1876) (upholding a state statute that prohibited non-state citizens from planting oysters in tidal lands); Smith v. Maryland, 59 U.S. 71, 74-75 (1855) (upholding a state statute that prohibited a federally licensed ship from dredging for oysters in the Chesapeake Bay). It may "retain[] for the general public the right to fish, hunt, or bathe on these lands." Phillips Petroleum, 484 U.S. at 482-84. Or, as it did here, it may relinquish title to a private landowner. Id. at 483; see also Dardar, 985 F.2d at 830 (stating that Louisiana may relinquish lands that are periodically overflown by the waters of the Mississippi). In any event, as things now stand, the right to fish on public trust lands is governed by Louisiana law, and there is no reason for us to displace that law by adopting a federal rule of decision in this context.[5] See Wallis v. Pan Am. Petroleum Corp., 384 U.S. 63, 68 (1966) (stating that it is for Congress to decide whether latent federal power should be exercised to displace state law).

## B. State Navigational Servitude

---

[5] Plaintiffs' argument to the contrary based on purported federal common law is unavailing. Plaintiffs point us to state court decisions that provide citizens with a state right to fish on navigable waters. But those cases merely prove that states generally regulate the use of public trust lands. Plaintiffs also rely on Silver Springs Paradise Co. v. Ray, 50 F.2d 356, 359 (5th Cir. 1931), where we stated that the owner of the bed of a navigable body of water in Florida could not enjoin the public from using the waters "for boating or sailing for pleasure." But again, Silver Springs is inapplicable because it applied state law to determine the scope of navigational rights. Id.

Plaintiffs argue that a state servitude burdens the Property and grants them the right to fish upon it when it is flooded. Plaintiffs assert that this right exists in the Louisiana Constitution, which provides that the freedom to hunt, fish, and trap wildlife is a valued natural heritage that will be forever preserved. See LA. CONST. art. I, § 27. They also find support in the Louisiana Civil Code, which provides that everyone has the right to fish in the State's rivers. See LA. CIV. CODE ANN. art. 452. Finally, they contend that the Property is burdened by the State for the public's use because Louisiana owns all of the running waters in the State. See id. art. 456. In response, Sheriff Shumate argues that the right to fish in Louisiana is explicitly limited to public lands and does not extend to private riparian property. Moreover, he argues that the Second Circuit Court of Appeal, while failing to hold that the Property is free of a state servitude because the issue was not properly raised, left a "guide post" for this court by noting in passing that the public does not have a right to fish on private lands. We agree with Sheriff Shumate.

First, the Louisiana Constitution, far from creating a private right to fish on the Property, explicitly reserves to private property owners the right to refuse consent to fishermen's entry on their land. The article Plaintiffs rely on reads:

> The freedom to hunt, fish, and trap wildlife, including all aquatic life, traditionally taken by hunters, trappers and anglers, is a valued natural heritage that shall be forever preserved for the people. . . . Nothing contained herein shall be construed to authorize the use of private property to hunt, fish, or trap without the consent of the owner of the property.

See LA. CONST. art. I, § 27.[6]  When the article is read in full, it is plain that the right to fish is circumscribed and does not extend to waters on private property.

Second, the Louisiana Civil Code does not create a right to fish upon the Property, even if we assume that the Property in its entirety is a bank of the Mississippi River.  Under Louisiana law, the "banks of navigable rivers are private things that are subject to public use."  LA. CIV. CODE ANN. art. 452; see also Buckskin Hunting Club v. Bayard, 868 So.2d 266, 275-76 (La. Ct. App. 2004).  The public use, however, is limited to use for navigational purposes. Walker Lands, 871 So.2d at 1268 n.6 (citations omitted); Buckskin Hunting Club, 868 So.2d at 276 (citation omitted).  As stated in the comments to article 456, "[a]ccording to well-settled Louisiana jurisprudence, which continues to be relevant, the servitude of public use under this provision is not 'for the use of the public at large for all purposes' but merely for purposes that are 'incidental' to the navigable character of the stream and its enjoyment as an avenue of commerce."  LA. CIV. CODE ANN. art. 452 cmt. b (citations omitted).  The Second Circuit Court of Appeal noted, in the parallel state proceeding, that fishing on the banks of the Mississippi River does not meet the definition of a navigational use.  Walker Lands, 871 So.2d at 1268 n.6 (citations omitted).  We agree.  See, e.g., State v. Barras, 602 So.2d 301, 305 (La. Ct. App. 1992) (holding that fishing was not incidental to navigation); Edmiston v. Wood, 566 So.2d 673, 675-76 (La. Ct. App. 1990) (same).

---

[6] This section of the Louisiana Constitution did not become effective until December 7, 2004.  We, therefore, do not cite it for the proposition that Sheriff Shumate had probable cause to arrest Plaintiffs, but to show that the hortatory passage Plaintiffs rely on is limited in nature.

Finally, we reject Plaintiffs' argument that they have the right to fish on the Property when it is submerged under the Mississippi River because "running waters" are public things owned by the State. Under Louisiana law, "public things" belong to the State, and "public things" include "running waters." LA. CIV. CODE ANN. art. 456. Plaintiffs argue that the public has a right to fish on the running waters of the State based on Chaney v. State Mineral Bd., 444 So.2d 105 (La. 1983). In that case, the Louisiana Supreme Court stated that the running waters over non-navigable streams are preserved for the general public. Id. at 109. This court has since determined that claims to the use of waterways based on Chaney have "failed to carry the day in Louisiana courts." Dardar, 985 F.2d at 834 (citation omitted). We have no reason to deviate from that holding. To the contrary, the Third Circuit Court of Appeal of Louisiana recently stated that although an owner must permit running waters to pass through his estate, Louisiana law "does not mandate that the landowner allow public access to the waterway." Buckskin Hunting Club, 868 So.2d at 274.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment.