# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 14, 2023

Lyle W. Cayce
Clerk

No. 22-30416

David Anthony Newbold; Briana Caroline Stockett;
Deanna Nicole Smith,

*Plaintiffs—Appellants*,

*versus*

Kinder Morgan SNG Operator, L.L.C.; Southern
Natural Gas Company, L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:21-cv-929

Before Wiener, Stewart, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

Two years after an unfortunate single-boat accident, one of the boat's two occupants died as a result of his injuries. The boat in which he was a passenger had struck a warning sign that was totally submerged at the time of the allision between the boat and sign. His estate and survivors sued the companies responsible for the sign in question. The district court granted summary judgment to the Defendants on the ground that the incident occurred on water governed by Louisiana law rather than federal. The parties

No. 22-30416

agree that if Louisiana law governs, the claims are barred. At issue in this appeal is whether or not the allision occurred in "navigable" waters such that federal law governs. For the reasons that follow, we hold that the allision occurred on non-navigable waters and thus AFFIRM the decision of the district court.

## Factual Background

On April 16, 2020, John Andrew Newbold and his nephew Jason Rodgers went fishing in the D'Arbonne Wildlife Refuge. As they were making their way back to the boat launch after a largely unsuccessful day, Newbold and Rodgers noticed a clear channel of water off to one side and decided to make one last go at fishing for the day. They turned into the swath and Rodgers, who was operating the boat, accelerated down the center. The boat then struck a submerged object and Newbold, who was sitting on a bench in the front of the boat, was ejected. Newbold hit his head on the boat's propeller, which left two large gashes on the left side of his head. Roughly two years later, Newbold died of those injuries.

It was later determined that the clear swath of water was atop a right-of-way granted to the Southern Natural Gas Company for two natural gas pipelines. Those pipelines, which are operated by Kinder Morgan,[1] cross Bayou D'Arbonne. The rights-of-way are mowed regularly and the land above which the allision occurred had been dry roughly 67 percent of the time in the past 30 years, according to an expert report prepared on behalf of the Defendants. The submerged item which the boat struck is believed to have been a sign warning boaters not to anchor or dredge above the pipeline. The sign was subsequently replaced after it was damaged by a hurricane, but at

---

[1] Collectively, Kinder Morgan and Southern Natural Gas will be referred to as "Defendants."

2

No. 22-30416

the time of the allision the sign was roughly 15 feet high. According to the Defendants' expert report, due to seasonal flooding, the sign has been submerged for roughly seven percent of the time across the past 30 years.

## Procedural History

Through a curator,[2] Newbold, joined by his children (collectively, "Plaintiffs"), filed a petition for damages against Kinder Morgan and Southern Natural Gas in Louisiana state court. The Defendants then removed to the Western District of Louisiana under diversity jurisdiction. After roughly a year of litigation in the district court, the Defendants filed a motion for summary judgment in which they sought dismissal on the grounds that Louisiana's Recreational Use Statute ("RUS") provided them immunity from tort liability on the uncontested facts. The Plaintiffs conceded that, if applicable, the RUS would bar recovery. They submitted, however, that "the location of the allision was navigable in fact and in law." Finding no material issue of fact on this issue, the district court held that the location was not navigable and thus granted summary judgment to the Defendants. This appeal followed.

## Standard of Review

"We review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007) (citing *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000)). "The court shall grant summary judgment if the

---

[2] At the time the petition was filed and removed, Newbold was alive but incapacitated. As has been noted, Newbold passed away during the pendency of litigation. His children, who were already in the suit, carried the suit forward and amended it to include a survival action.

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## Discussion

"It is well established that the Commerce Clause of the United States Constitution gives the federal government a 'dominant servitude' over the navigable waters of the United States." *Parm*, 513 F.3d at 142-43 (quoting *United States v. Cherokee Nat. of Okla.*, 480 U.S. 700, 704 (1987)). Congress has exercised that power in part to declare that "[t]he creation of any obstruction not affirmatively authorized by Congress[] to the navigable capacity of any of the waters of the United States is prohibited." 33 U.S.C. § 403. Louisiana law, however, provides that "[a]n owner, lessee, or occupant of premises owes no duty of care to keep such premises safe … for … fishing … or boating or to give warning of any hazardous conditions … whether the hazardous condition … is one normally encountered … or one created by the placement of structures." La. Rev. Stat. § 9:2791. Louisiana courts have noted, however, that "an injury which occurs on a navigable waterway … is not subject to a defense under" this statute. *Buras v. United Gas Pipeline Co.*, 598 So. 2d 397, 400 (La. Ct. App. 1992). As such, the parties agree that if the injury occurred in navigable water, summary judgment was unwarranted; if, conversely, the injury occurred in non-navigable water, summary judgment is appropriate.

We have elsewhere noted that "[t]he navigational servitude does not burden land that is only submerged when the river floods." *Parm*, 513 F.3d at 143. The location of the allision is on such land. Any flood waters on land unburdened by the navigational servitude are by definition not navigable for purposes of federal law and summary judgment would therefore be appropriate. However, the Plaintiffs posit three independent grounds by

No. 22-30416

which they suggest an exception to this general rule may be found. Each are addressed in turn.

**I. Whether, due to rights procured by the Army Corps of Engineers, the navigational servitude for the Refuge is 65 feet above mean sea level.**

The first ground on which the Plaintiffs claim that the allision took place on navigable water is that the "navigational servitude" for the Refuge is alleged to be 65 feet above the mean sea level ("MSL"). The allision is claimed to have occurred at 55 feet above MSL. As part of the Comprehensive Conservation Plan for the Refuge, the Army Corps of Engineers "has the right to permanently flood those lands lying below 65 feet above MSL and to flood on a seasonal basis any land lying between 65 feet above MSL and 70 feet above MSL." As such, Plaintiffs assert that the navigational servitude for the land of the Refuge is now 65 feet above MSL. At no point do the Plaintiffs assert that the Corps has, in fact, permanently flooded the Refuge, though the Comprehensive Conservation Plan notes that seasonal flooding may reach as high as 70 feet above MSL at times (a rise which the Plaintiffs attribute to the Corps' work). In response, the Defendants contend simply that "[t]he right to flood a national wildlife refuge, and not doing so, does not create navigable waters where none exist."

Any water burdened by the navigational servitude is by definition navigable, and federal law would therefore apply. "The so-called navigational servitude extends 'laterally to the entire water surface and bed of a navigable waterway, which includes all the land and waters below the ordinary high water mark.' A river's ordinary high water mark is set at 'the line of the shore established by the fluctuations of water.'" *Parm*, 513 F.3d at 143 (quoting 33 C.F.R. § 329.11(a)) (internal citation omitted). In other words, the navigational servitude relates to actualities – "the waters below the ordinary high water mark," "the line of the shore," and so forth, *id.* – rather than

potentialities. Should the Corps permanently flood the Refuge, the water there would likely be navigable. But as the parties agree that the Corps has not in fact permanently flooded the refuge, the water may not be said to be navigable under this theory.

## II. Whether the allision occurred below the ordinary high-water mark of the Bayou D'Arbonne.

The district court reasoned that the location of the allision is below the ordinary high-water mark of the Bayou D'Arbonne because "[t]he area … is dry 67% of the time." What's more, the district court suggested that "[t]he fact that the area has vegetation at all shows it is outside of the navigable waters of Bayou D'Arbonne." This latter ground, the Plaintiffs suggest, "defies over a century of jurisprudence and is inconsistent with the tests established by the Corps, and state and federal courts." Instead, Plaintiffs submit that the ordinary high-water mark "is found at the line below which the water is so consistently present that it changes the soil and destroys the terrestrial vegetation and agricultural value of the land." The channel in which the allision occurred, an expert employed by the Plaintiffs concluded, is a "semi-permanently flooded" area which "is not … suitable for agriculture, grazing, or growing and harvesting desirable or marketable hardwood timber." Thus, Plaintiffs submit, the location of the allision is below the ordinary high-water mark of the Bayou.

Any water below the ordinary high-water mark of a navigable waterbody is navigable. "A river's ordinary high water mark is set at 'the line of the shore established by the fluctuations of water.' It is ascertained by 'physical characteristics such as a clear, natural line impressed on the bank; ... changes in the character of the soil; destruction of terrestrial vegetation; ... or other appropriate means that consider the characteristics of the surrounding areas.'" *Parm*, 513 F.3d at 143 (quoting 33 C.F.R. § 329.11(a))

(internal citation omitted). None of these characteristics – clear banks, changes in soil, destruction of vegetation and so on – is dispositive in itself. Instead, they are markers which direct courts to the type of characteristics worth evaluating: namely, "physical characteristics" which "consider the characteristics of the surrounding areas." A vegetation-based test may not be useful, for example, in a desert area in which vegetation is scarce; likewise, a vegetation-based test may be difficult to apply in a swampy area in which vegetation coincides with standing water. The D'Arbonne National Wildlife Refuge, in which the relevant location sits, is "17,421 acres of deep overflow swamp, bottomland hardwood forest, and mixed pine/hardwood uplands" which is held by the United States for the "conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon."

Plaintiffs suggest that we follow the test laid out in *Borough of Ford City v. United States*, in which the Third Circuit held that the ordinary high-water mark should be determined by finding "the land upon which the waters have visibly asserted their dominion, the value of which for agricultural purposes has been destroyed." 345 F.2d 645, 648 (3d Cir. 1965). "[T]he vegetation test for a navigable stream's ordinary high-water mark means not that within such line all vegetation has been destroyed by the water covering the soil but that the soil has been covered by water for sufficient periods of time to destroy its value for agricultural purposes." *Id.* As noted in that very case, however: "The vegetation test is useful where there is no clear, natural line impressed on the bank. If there is a clear line, as shown by erosion, and other easily recognized characteristics such as shelving, change in the character of the soil, destruction of terrestrial vegetation, and litter, it determines the line of ordinary high-water." *Id.* at 648.

Here, the location of the allision is on land that is dry 67 percent of the time, where vegetation is not destroyed and the land is not bare, as evidenced by the need to mow it with some regularity. More significantly, the Bayou

D'Arbonne *does* have an "unvegetated channel" which is some 597 feet wide at the location where the boat split off to fish near the sign. The sign was located 58 feet away from the unvegetated channel. The unvegetated channel is a neat, natural line by which the ordinary high-water mark may be established. Within the channel, there is no vegetation; outside of it, there is.

In *United States v. Harrell*, the Eleventh Circuit rejected a definition of the navigational servitude that would have extended it "laterally over the entire area covered by the ordinary high waters of the stream, including tributaries that might not otherwise be considered navigable and areas *adjacent to the low water channel that revert to a swampy or even a dry condition as the waters recede*." 926 F.2d 1036, 1043 (11th Cir. 1991) (emphasis in original opinion). The court there called the proposed definition "ludicrous" and cited favorably the district court's assertion that such a definition "would recognize no horizontal limits to the bed of a navigable river in those areas where the banks are relatively low and flat." *Id.* (internal quotation marks and citation omitted). That language applies equally here. The unvegetated channel establishes the ordinary high-water mark of the Bayou; water outside of that channel is not navigable.

## III. Whether the location is navigable in fact.

Alternatively, the Plaintiffs suggest that "there is a question of material fact as to whether the location of allision is susceptible of being used in its ordinary condition as a highway for commerce." To be clear, there is no allegation that the channel *is* currently being used for commercial purposes; the nearest evidence of that is that the boat in which Mr. Newbold was a passenger was able to traverse the channel, but "[n]either navigation nor commerce encompass recreational fishing." *Parm*, 513 F.3d at 143 (citations omitted). Instead, the Plaintiffs suggest that the channel has the *potential* to be used for commerce, and that it *may* be used either presently or

in the future for commerce in manners as yet apparently unknown to either the Plaintiffs or the court. As possible evidence for this, Plaintiffs note that the very placement of the sign suggests that the Defendants "expected water levels to be frequently high enough for boats to regularly travel through the area."[3]

In 1870, the Supreme Court declared that the term "navigable" refers to "every stream or body of water, susceptible of being made, in its natural condition, a highway for commerce, even though that trade be nothing more than the floating of lumber in rafts or logs." *The Daniel Ball*, 77 U.S. 557, 560 (1870). The Supreme Court has also made clear that "[t]he extent of existing commerce is not the test" for navigability. *United States v. Utah*, 283 U.S. 64, 82 (1931). Instead, while "[t]he evidence of the actual use of streams, and especially of extensive and continued use for commercial purposes may be most persuasive, … where conditions … explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved." *Id.* As a later Supreme Court decision summarized, "lack of commercial traffic [is not] a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 416 (1940) (citing *Utah*, 283 U.S. at 82).

Finally, "[n]avigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all

---

[3] At oral argument, Defendants' counsel suggested that the sign was not intended for boaters traversing the seasonally-flooded right-of-way but was instead designed to warn boaters on the Bayou D'Arbonne itself not to anchor over the pipeline. Given the posture of the case, we assume as correct Appellant's position on the matter.

stages of the water." *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 122 (1921). "Indeed, there are but few of our fresh-water rivers which did not originally present serious obstructions to an uninterrupted navigation. … the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so the river is navigable in fact." *The Montello*, 87 U.S. 430, 443 (1874).

The Plaintiffs here fail to present even slight evidence concerning a commercial purpose for the channel in question. The closest they get is noting that the presence of the sign evinces expected boat traffic in the channel. The forms of evidence which convinced the Supreme Court that particular bodies of water are navigable are illustrative as to why this is insufficient. The Supreme Court has found navigability in fact on the basis of: (1) accounts of "large interstate commerce" involving "vessels from seventy to one hundred feet in length, with twelve feet beam, [which] drew when loaded two to two and one-half feet of water," *The Montello*, 87 U.S. at 441, (2) evidence that a channel had previously been used to support the fur trade, *Econ. Light & Power Co.*, 256 U.S. at 117, (3) evidence that a relevant section of the Colorado river had been used for "a large number of enterprises, with boats of various sorts, including rowboats, flatboats, steamboats, motorboats, barges and scows, some being used for exploration, some for pleasure, some to carry passengers and supplies, and others in connection with prospecting, surveying, and mining operations," *Utah*, 283 U.S. at 82, and (4) evidence of "two keelboats operating in 1881, eight in 1882, and eight together with a small steamboat in 1883 …. [which] carried iron ore and pig iron, as well as produce and merchandise," *Appalachian Electric Power Co.*, 311 U.S. at 411–12. No evidence of the sort exists here. If the channel in question, in its ordinary condition, has potential commercial value such that it may be called "navigable," Plaintiffs have not carried their burden to "satisfactorily prove[]" as much. *See Utah*, 283 U.S. at 82. Thus,

the water in which the allision occurred was not navigable and summary judgment was proper.

## **<u>Conclusion</u>**

The district court's judgment is AFFIRMED.