# United States Court of Appeals
# for the Fifth Circuit

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

June 26, 2024

Lyle W. Cayce
Clerk

No. 23-30405

———————————

Devin Thibodeaux; Herby Angelle,

*Plaintiffs—Appellees*,

*versus*

Adam Bernhard, *individually on behalf of* Kenneth W.
Bernhard, *agent of* Kerkas L.L.C.; Kenneth W. Bernhard;
Kerkas, L.L.C.; Seth Bernhard, *individually and acting on behalf of*
Kenneth W. Bernhard and Kerkas L.L.C.,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:21-CV-61

———————————————————————

Before Jones, Dennis, and Douglas, *Circuit Judges*.

Per Curiam:[*]

The question raised is whether a district court may exercise its admiralty jurisdiction over a tort that occurred in a lake within Louisiana's Atchafalaya Basin. On the particular facts that have been shown in this case, the answer is yes: The lake is susceptible to use in its ordinary condition as a

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

highway of interstate commerce through its unity with the Atchafalaya River. We accordingly AFFIRM the district court's ruling.

## I

As our nation's largest floodplain swamp, the Atchafalaya Basin offers picturesque scenery of bottomland forests, swamps, bayous, and backwater lakes. The Basin's central artery is the Atchafalaya River, which spans 140 miles before converging in the Gulf of Mexico. As it meanders to the sea, the river flows alongside marshes and several small inland waterbodies, like the one at issue in this case, Lost Lake. Lost Lake connects to the Atchafalaya River around thirty percent of the year through a twenty-foot drainage canal. Fortunately for locals, the period of Lost Lake's accessibility coincides with crawfish season—a fact that makes the area lucrative to commercial fishermen seeking to use its water bottoms to bring crawfish to market. Even so, crawfishing on Lost Lake is restricted because the waterbody sits atop private land.

That reality, however, did not stop two commercial fishermen—Herby Angelle and his grandson, Devin Thibodeaux (collectively the "Fishermen")—from attempting to harvest crawfish in Lost Lake's waters. One day, the Fishermen provoked the ire of Lost Lake's owner, Seth Bernhard, after Bernhard discovered that the Fishermen were laying traps. Bernhard allegedly harassed the Fishermen, intercepted their skiff, and contacted a sheriff's deputy, who issued the interlopers criminal trespass citations. After the altercation, the Fishermen sued Bernhard and other related defendants (collectively, the "Bernhards") for loss of income and conversion of crawfish traps. The Fishermen filed their complaint in federal court, hoping to invoke its admiralty jurisdiction under 28 U.S.C. § 1333. In

response, the Bernhards moved to dismiss the Fishermen's complaint.[1] According to the Bernhards, Lost Lake is a private waterbody with no connection to traditional maritime activity, and so, it is not susceptible to the court's admiralty jurisdiction. The magistrate judge agreed and issued a Report and Recommendation ("R&R") to that effect, recommending the dismissal of the Fishermen's lawsuit.

But after a de novo review, the district judge rejected the R&R and issued its own ruling, holding that the Fishermen's claims established the requisite connection to traditional maritime activity. The court then remanded the case to the magistrate judge for an evidentiary hearing to determine Lost Lake's navigability and the location of the tort giving rise to the causes of action. After conducting the hearing, the magistrate judge issued another R&R where she concluded that the court had the authority to hear the case based on federal-question jurisdiction under 28 U.S.C. § 1331. She accordingly punted the question of Lost Lake's navigability and, as a result, the question of the court's admiralty jurisdiction. Although the district court accepted the R&R's factual findings, it disagreed with the R&R's legal conclusions and made one of its own: It held that Lost Lake qualified as a navigable waterbody, thus confirming that the court had the authority to resolve the case under its admiralty jurisdiction provided under 28 U.S.C. § 1333. The Bernhards timely appealed that ruling.

## II

This court reviews a ruling on a motion to dismiss for lack of subject matter jurisdiction de novo. *T.B. v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1050 (5th Cir. 2020). If the district court addressed factual disputes when

---

[1] The Bernhards filed a 12(b)(6) motion to dismiss for failure to state a claim, but the court converted it to a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

resolving such a motion, we defer to its factual findings unless they are "clearly erroneous." *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413–14 (5th Cir. 1981)).

## III

Federal courts have the power to exercise decision making authority over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). Parties seeking to invoke such jurisdiction bear the burden of establishing it. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). To do so, they must satisfy a two-part test. The first element of the test is referred to as the "location" portion. That inquiry focuses on whether the tort at issue occurred on navigable waters. *Id.* The second element, or "connection" portion, requires courts to consider whether the tort has a sufficient connection to maritime activity. *Id.*

## A

On appeal, the Bernhards make no argument regarding the second portion of the jurisdictional inquiry. Even so, such an issue cannot be waived, for this court has an independent obligation to ensure that it has the authority to resolve the merits of the Fishermen's challenge. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists."). We accordingly begin our jurisdictional analysis by asking whether the tortfeasor's conduct here has a sufficient connection to maritime activity. *Grubart*, 513 U.S. at 539.

That inquiry involves two questions. The first is whether the "general features of the type of incident involved" have "a potentially disruptive impact on maritime commerce." *Grubart*, 513 U.S. at 534 (quoting *Sisson v. Ruby*, 497 U.S. 358, 363–64 (1990) (internal quotations omitted)). Addressing this issue requires us to consider "whether the incident could be

seen within a class of incidents that pose[] more than a fanciful risk to commercial shipping." *Id.* at 539. We agree with the district court that the Bernhards' actions disrupted maritime commerce by preventing the Fishermen from freely navigating their vessels in the Lost Lake area of the Atchafalaya Basin. That is because impeding "plaintiffs' ability to harvest crawfish from their traps," poses more than a fanciful risk to the Fishermen's commercial fishing efforts. Accordingly, the incident is one that satisfies the first prong of the connection analysis. *See id.*

The second question is a bit more complex. It asks whether the "general character of the [tortfeasor's] activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* In making this determination, courts must define activity "by the general conduct from which the incident arose," not by the incident's "particular circumstances." *Sisson*, 497 U.S. at 364. The Supreme Court has acknowledged that this inquiry is an imprecise one, but it has emphasized that a court must refrain from defining the character at such a "high level of generality [as] to eliminate any hint of maritime connection." *Grubart*, 513 U.S. at 541–42.

It is true that the Bernhards thwarted navigation and fishing efforts by harassing and accosting the Fishermen. And perhaps alone, such conduct may lack a maritime nexus. But as noted, the Fishermen further allege that the Bernhards unlawfully detained the Fishermen's vessel and the 700 fishing traps they laid throughout Lost Lake. Those traps, the Fishermen say, were set for commercial fishing purposes, and the Bernhards' illegal conversion inevitably resulted in the Fishermen's inability to engage in their trade. By commandeering the Fishermen's vessel and seizing the Fishermen's fishing equipment, the Bernhards interfered with a traditional maritime-based activity. Indeed, fishing the country's waterways is intrinsic to water-based commerce and sufficiently linked with millennia-old

No. 23-30405

maritime-related tradition. *See, e.g.*, *Tobar v. United States*, 639 F.3d 1191, 1198 (9th Cir. 2011); *Belk v. Entergy Louisiana, LLC*, No. CV 22-1443, 2022 WL 17083381, at *2 (E.D. La. Nov. 18, 2022); *Carpenter v. Webre*, No. CV 17-808, 2018 WL 1453201, at *18 (E.D. La. Mar. 23, 2018). The general character of the tortfeasor's activity giving rise to the incident here thus relates to "traditional maritime activity." *See Sisson*, 497 U.S. at 367.

B

With the connection element satisfied, we turn next to a more hotly contested issue on appeal: The "location" portion of the jurisdictional test. *Grubart*, 513 U.S. at 534. Admiralty jurisdiction is limited to torts that occur on "navigable waters." *Sanders v. Placid Oil Co.*, 861 F.2d 1374, 1376 (5th Cir. 1988). Determining whether a waterbody fits within that description hinges on whether it is "navigable in fact." *Id.* at 1377 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1870)). That inquiry, in turn, focuses on whether the waterbody is suitable, in its ordinary condition, for interstate travel and commerce. *See id.* Though the district court held that Lost Lake meets that standard, the Bernhards and Amicus Louisiana Landowners Association disagree, arguing that the district court misapplied law and facts. The Fishermen and their supporting Amici,[2] by contrast, believe that Lost Lake is navigable for purposes of exercising jurisdiction under 28 U.S.C. § 1333— a conclusion that they say is supported by Lost Lake's historical use and its unity with the Atchafalaya River, a highway of interstate commerce.

Before addressing the parties' dispute, we first consider the relevant facts, adopted by the district court, and supported by the record:

---

[2] The Louisiana Charter Boat Association, Louisiana Sportsmen's Coalition, Inc., and Backcountry Hunters and Anglers filed an amicus brief.

(i) Lost Lake is a "perched lake situated in a crook of undeveloped swampland between the Atchafalaya River and the Butte LaRose Cutoff Channel." A perched lake is "one in which the bottom of the lake is above the mean level of water in the surrounding river channels." Lost Lake is surrounded primarily by recreational property owned by Defendants.

(ii) A 10-to-20-foot-wide canal runs from Lost Lake to the Atchafalaya River. The Lake is accessible by water exclusively through a canal for roughly 110 days each year. Notably, Lost Lake's accessibility coincides with crawfish season.

(iii) The depth of Lost Lake fluctuates with the depth of the Atchafalaya River. The Lake typically has a depth of 1.5–7.5 feet but, during particularly dry seasons, can "dr[y] up into ponds." At the time of the incident giving rise to this dispute, Lost Lake was approximately five feet deep.

(iv) Although it first appeared on a map in the late 1960's, it is unclear when or how the canal connecting Lost Lake to the Atchafalaya River first developed. However, "[o]ver the past several decades, the [canal] grew, likely due to erosion, from a small ditch to a larger body of water through which small boats, such as Plaintiffs' crawfish skiff[s], could pass [] when the water was high enough."

(v) Lost Lake was first identified by that name in 1968, but it has been cartographically identified as a "low-lying, swampy area with numerous iterations over the years."

(vi) The state of Louisiana does not "presently" assert ownership over "the bed and bottom" of Lost Lake. However, fishermen—including Plaintiffs—have crawfished Lost Lake for generations.

With those facts in mind, we begin, as did the district court, by considering the waterbody's seasonal fluctuation. Even though Lost Lake is only navigable for a portion of the year, the district court found that such a

circumstance did not foreclose a finding of navigability. That logic is supported by our caselaw holding as much. In *Sanders v. Placid Oil Co.*, 861 F.2d at 1377, for example, we considered the navigability of Catahoula Lake. Catahoula's hydrology distinguishes it from other waterbodies in Louisiana, as it "fluctuates from nearly dry to up to 20 feet deep each year." Richard Keim, *Water Management at Catahoula Lake*, in 58 La. Agric. 8, 9 (2015). Despite such seasonal variation, we concluded that we could exercise admiralty jurisdiction over disputes in its waters. *Sanders*, 861 F.2d at 1378. We reasoned that Catahoula Lake was historically used by small vessels, crew boats, and commercial fur trappers and fishermen. *Id.* We also held that the lake was connected to interstate waterbodies at its high-water mark through tributaries and was consequently navigable for purposes of exercising admiralty jurisdiction. *Id.*

As with Catahoula Lake, the district court here found that Lost Lake was connected to an interstate waterbody, the Atchafalaya River, through an access point—a twenty-foot drainage canal. The River, the district court concluded, is a large artery of commerce that provides direct access to the Gulf of Mexico, approximately 100 miles to Lost Lake's south. And while Lost Lake's access point may be inaccessible for a portion of the year, the district court reasoned that the brief period of access coincides with the commercially relevant crawfish season. Historically, crawfishermen have fished the area using small ships that access Lost Lake's waters. In the court's view, these facts tended to show that the area was navigable and susceptible to commerce. Because Lost Lake enjoys annual access to the Atchafalaya River for a commercially significant period, the court held that Lost Lake is "susceptible of being used, in its ordinary condition [and] by uniting with other waters, as a continued highway for [interstate] commerce[.]"

Applying similar reasoning, another district court in this circuit made the same determination concerning a different, albeit very similar waterbody.

In *Meche v. Richard*, No. CV 05-0385, 2007 WL 634154, at *4 (W.D. La. Feb. 26, 2007), the court addressed whether it could exercise admiralty jurisdiction over an incident occurring on a separate waterway in the Atchafalaya Basin. Like Lost Lake, the waterbody in *Meche* could be inundated with high water during certain seasons and had an identifiable, navigable channel that allowed ships to move in and out of its waters. In making its jurisdictional determination, the district court held that the lake was navigable, even though access to the Atchafalaya River was only available seasonally. *Id.* at * 3. And while a tanker, tugboat, or similar vessel may not fit in the low-lying waterbody, pirogues and other fishing vessels could. *Id.* at *4. Pointing to these facts, the court concluded that "the manner and mode of access to the [lake] . . . is unique to the Atchafalaya Basin itself and is one which has been developed for and adapted to the unique nature of the Basin and the unique nature of the commerce conducted within the Atchafalaya Basin." *Id.*

Despite the reasoning in *Sanders* and *Meche*, the Bernhards nevertheless say the district court's findings here are foreclosed by other cases addressing private land flooded by a neighboring navigable waterway. They point, for example, to *Parm v. Shumate*, 513 F.3d 135, 145 (5th Cir. 2007), a case involving a privately owned, landlocked lake in North Louisiana that received runoff from the Mississippi River's flooding. Because the waterbody in *Parm* was susceptible to overflow from a navigable river, plaintiffs there argued that they had a federal or state right to recreationally fish on the landowner's property. *Id.* at 142–44. We disagreed and held that the plaintiffs had no such right because the land was privately owned according to a Louisiana state court holding that the lake was non-navigable. *Id.* at 140. We concluded that there was no navigational servitude, and the lake's private owners could thus restrict public access. *Id.*

No. 23-30405

At first blush, *Parm* might seem to support the Bernhards' belief that Lost Lake is a non-navigable waterbody. After all, both waterbodies are located on private land and vulnerable to flooding from a neighboring river. But a closer look shows that *Parm* is distinguishable in several respects. For one thing, Lost Lake has factual characteristics distinguishable from the waterbody in *Parm*. One example is that Lost Lake has a direct, seasonal connection to a navigable River via a ten-to-twenty-foot canal. Additionally, the case here does not concern sporadic flooding of private land, but rather a "perched lake" directly connecting to a river for seasonal period each year. Crucially, the Fishermen have also shown, based on the district court's factual findings, that Lost Lake has historically supported commercial fishing activities on its water bottoms. No similar allegations were made in *Parm*.

Perhaps more importantly, *Parm* does not address navigability for purposes of "establish[ing] the limits of the jurisdiction of federal courts conferred by Art. III, § 2, of the United States Constitution over admiralty and maritime cases."[3] *Kaiser Aetna*, 444 U.S. at 172. To be sure, we did not engage in *any* navigability analysis in *Parm*; as noted, we considered whether a federal navigational servitude extended on flooded private property. Here, by contrast, the district court expressly "made no determination as to whether the federal navigational servitude extends over Lost Lake." Even if it had, such a finding would not "necessarily permit Plaintiffs to harvest

───────────────────

[3] As noted above, the court also reiterated that Louisiana does not "presently" assert ownership over "the bed and bottom of Lost Lake." But relevant here, that fact is not controlling when considering current navigability for purposes of "establish[ing] the limits of the jurisdiction of federal courts conferred by Art. III, § 2, of the United States Constitution over admiralty and maritime cases." *See Kaiser Aetna v. United States*, 444 U.S. 164, 172 (1979); *Finneseth v. Carter*, 712 F.2d 1041, 1044 n.4 (6th Cir. 1983); *see also Boudreaux v. La. Dep't of Wildlife & Fisheries*, No. CV 6:11CV0834, 2014 WL 4219446, at *8 (W.D. La. Aug. 22, 2014) ("Whether or not the area in question is claimed by the State as a navigable waterway is not determinative of admiralty jurisdiction.").

crawfish there." *See Parm*, 513 F.3d at 143. ("[T]he [federal] navigational servitude does not create a right to fish on private riparian land."). Therefore, whether Lost Lake is accessible for public use is still a live question that this jurisdictional inquiry does not resolve.

That *Parm* did did consider navigability for determining admiralty jurisdiction is characteristic of a broader trend in the parties' briefing: Most authority the Bernhards cite in support of their argument does not address jurisdictional issues; it addresses public servitude rights or other navigability questions arising under different sources of law. *See, e.g.*, *id.* (considering the reach of federal navigational servitude); *State v. Barras*, 615 So.2d 285 (La. 1993) (applying Louisiana law to determine whether swamp land susceptible to overflow was a public or private thing); *Newbold v. Kinder Morgan SNG Operator, L.L.C.*, 65 F.4th 175, 178 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 186 (2023) (discussing navigational servitude). That distinction is critical, for "any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of 'navigability' was invoked in a particular case." *Kaiser Aetna*, 444 U.S. at 171 (citation omitted).

IV

In the end, while the Bernhards may claim that the district court improperly applied certain facts, they do not dispute the facts' accuracy. We accordingly hold that on the unusual facts shown before us, the district court did not err in finding that (1) the Lost Lake area is and has historically been used to commercially harvest crawfish on small watercrafts; (2) though temporary, Lost Lake's accessibility from the Atchafalaya River coincides with the most commercially viable period for crawfishermen; and (3) Lost Lake is connected to the Atchafalaya River through a ten to twenty foot wide drainage canal. In adopting those findings and applying an independent legal review, we agree with the district court's conclusion that Lost Lake is

navigable for purposes of establishing admiralty jurisdiction under 28 U.S.C. § 1333. On that basis, the district court's ruling is

AFFIRMED.